HEBARD *v.* SHAW.

1. LOGS AND LOGGING—TOWAGE CONTRACT—CONSTRUCTION.
   Where defendant contracted with plaintiffs to supply him
   with a tug and booms for towing logs, representing to them
   that he had about 500,000 feet of logs, without specifying
   their size, and plaintiffs furnished under such contract a tug
   and a boom large enough to raft 500,000 feet of average-sized
   logs, plaintiffs were not liable for a loss occasioned by over-
   crowding, due to the fact that defendant's logs were below
   the average size.

2. SAME—PRINCIPAL AND AGENT—REPRESENTATIONS—AUTHORITY.
   Where a tug was hired for towing logs under a contract pro-
   viding that it should work for the owner of the logs, and
   that he should assume the risks of loss, the tug-owners were
   not bound by representations of the captain of the boat
   to the effect that a boom furnished with the tug would hold
   all the logs proposed to be rafted, although the log-owner
   was thereby induced to overcrowd the boom, and, in conse-
   quence, lost his logs.

Error to Marquette; Stone, J.   Submitted February 7,
1900.   Decided March 27, 1900.

*Assumpsit* by Charles Hebard and another against
George W. Shaw for services rendered.   From a judg-
ment for defendant, plaintiffs bring error.   Reversed.

*Hill & Smith* (*John R. Rood* and *A. R. Gray*, of
counsel), for appellants.

*Button & Culver*, for appellee.

HOOKER, J.   The plaintiffs are owners of a tug, and
contracted to furnish the same for towing the logs of the
defendant at a price per diem.   The tug was furnished,
and this action is brought to recover compensation for its
use.   The defendant gave notice of recoupment, and

obtained a verdict and judgment for upwards of $1,700, and the plaintiffs have brought error.

The contract was made through a series of letters and telegrams, of which we will state the substance. September 14, 1895, the defendant wrote plaintiffs that he had between four and five hundred thousand feet of logs which he wanted towed from Lake Independence to Skanee. He asked a price per 1,000 feet for towing. The letter showed that he expected the tug-owners to furnish booms. September 17th, plaintiffs answered, offering to furnish tug early the next week to tow the logs, but stating that they would not tow by the 1,000 feet, or assume any risk as to the loss of logs, and that they hired their tugs by the hour, and let them work for the man who hired them, and he assumed all the risks. The price named was five dollars an hour working time, and three dollars an hour "laying time." The letter continued as follows:

"If we furnish booms, the use of them is not included in above, and we shall charge you for any damage they sustain; and, if they are lost, you are to pay for them, or, if they go on the beach, the time of the tug in recovering them will be charged for at the same rates as for towing logs. If you wish a tug as above, let us know immediately. Would prefer that you furnish booms."

Some unimportant telegrams next passed, and on Seper 18th defendant wrote that he had—

"Decided to take tug Hebard. How soon can I get her? * * * Can you furnish enough booms to go around logs twice? I could furnish booms, but have no way to get same to Yellow Dog and back again. * * * I would like to know just what time I can expect tug to be at Yellow Dog river, and will be there waiting, so as not to cause any delay at all. Write me fully, and also in regard to booms. * * * Notify me and advise me fully on receipt of this at what time you will be at river with tug and booms (put in largest booms you have), and will be there waiting for you."

September 19th plaintiffs wrote:

"We will send tug as soon as we can spare her, which will not be for several days. We will give you ample

notice. We will send boom, also. * * * It is not probable that we will send tug before Tuesday or Wednesday. We will do work just as if it were our own.''

On September 20th defendant replied:

"Will have to be notified about two days before tug will be there. * * * It will be necessary for me to know about what hour and what day you will be there, so I can be down to the lake, and not keep you waiting. Have sufficient boom so we can make a lap around back end of the logs. In all, there is about 500,000 feet. Want to use all the precaution possible.''

September 20th defendant telegraphed: "Will go up Monday if Hebard [i. e., tug] can be there Tuesday morning. Written. Answer letter by wire.'' Plaintiffs wired September 21st: "You may expect tug, boom, and two men at Yellow Dog, daylight Tuesday.'' The defendant was at Yellow Dog on Tuesday morning at daylight with his men. The tug reached there Wednesday morning about 9 o'clock, plaintiffs having found it necessary to send her to look up some lost cedar logs of their own on Monday. She brought with her a boom of 28 sticks, each 40 feet long. It is claimed by the defendant that this was inadequate to hold the logs, and that, to get them all in, they were piled upon one another until they grounded, and the tug could not draw them out, and that the captain then anchored the boom with a buoy, and went to Marquette for more boom, where he was detained for a time by the weather, and when he returned the boom had gone ashore, and the logs were scattered along the beach. Some, but not all, were recovered and towed to their destination.

The defendant claimed damage for loss of time for his men while awaiting arrival of the tug, for logs lost, and for loss from the injury to the logs by abrasion from going on the beach. The plaintiffs claimed that the boom was large enough to accommodate 500,000 feet of logs, which was all the boom they were under obligation to bring, and that the risk of loss was the defendant's, under the con-

tract.    Some other questions will be alluded to as the case
is discussed.

We are of the opinion that a fair construction of the
contract was that plaintiffs undertook to furnish a tug
and sufficient boom to inclose 500,000 feet of logs, and
that they did not assume the risk of weather or accident,
unless due to negligence or disobedience of the defendant's
orders, neither of which is claimed.    We think the plain-
tiffs were liable for loss of time occasioned by the delay in
her arrival.    That is the limit of their liability, if it can
be said that they brought as large a boom as the contract
required.    The jury found that they did not, and this must
be final upon that question, unless the undisputed evidence
shows the contrary, as is claimed by plaintiffs' counsel.
The defendant testified that there were 492,000 feet of his
own logs, consisting of 4,852 pieces, according to the
scale, and that some logs (probably about 200) belonging
to other people came down with them.    The owner of the
mill which cut the logs testified that 181 logs bearing the
mark of another owner were brought to the mill with the
defendant's logs.    These, if of the same average size of
the defendant's logs, would amount to 18,000 feet; and if,
as the witness said, they were larger, they would amount
to more.    His opinion was that they would run 6 to the
1,000, which would make 30,000 of those received and
sawed, to say nothing of those lost; for it is improbable
that there was not some loss from these logs as well as the
others.    But, taking defendant's own estimate as to num-
ber, there were from 20,000 to 33,000 feet of those logs, in
addition to the 492,000 feet, which defendant attempted to
put in the boom.    At the very lowest computation there
were 510,000 feet, and at the highest 533,000 feet, of the
logs, which defendant attempted to crowd into a boom
which was expected to hold 500,000 feet.    The defendant's
own brief places the amount at 517,000 feet.

The contract made by these parties was in writing.    Its
construction, therefore, was for the court.    If there was
any ambiguity, it was upon its face; and, if it were not,

no circumstances which would throw light upon it were shown. In construing this contract the court, in effect, said to the jury that the plaintiffs agreed to bring boom sufficient for "a few thousand feet" more than 500,000 feet of logs, and left the jury to determine how much more than 500,000 feet they were under obligation to provide for. The agreement of the plaintiffs is to be ascertained from the whole correspondence. On September 14th defendant wrote that he had between 400,000 and 500,000 feet of logs for which he wanted a boom brought. On September 18th he wrote, accepting an offer on that basis, and inquired if plaintiffs could furnish boom enough to go around logs twice. On September 20th he wrote, asking to be notified when tug would arrive, and said: "Have sufficient boom so we can make a lap around back end of logs. Put in the largest boom you have. In all, there is about 500,000 feet. Want to use all precaution possible." From this correspondence, we think it cannot be said that plaintiffs did more than promise to provide a boom for 500,000 feet. Indeed, at the time defendant said he would take the tug, he had not intimated that he had 500,000 feet, and even his last letter did not claim more, but gave plaintiffs to understand that it was necessary to provide for nearly 500,000 feet. It is true that he asked for the largest boom they had, but the inference naturally to be drawn was that he wanted it to lap around end of logs, or, as he had previously said, "to go around the logs twice." There was never an intimation that he expected them to provide for more than 500,000 feet. They had a right to suppose that a boom that would accommodate 500,000 feet was all that was necessary, and they had no reason to expect that they would be required to put more than 500,000 feet in the boom, and then be held liable for several hundred dollars' loss because it would not accommodate them. The jury should have been instructed that, if they sent a boom sufficient to accommodate 500,-000 feet of logs, the plaintiffs performed their contract; and, unless there was evidence tending to show that they

did not send a boom of that capacity, the question should not have gone to the jury.

There was testimony offered by defendant tending to show that the defendant's foreman advised him that the boom would not accommodate his logs, and that the captain of the tug assured him that it would, and insisted that they be run into the boom. Exception was taken to the admission of this testimony. If the testimony was to be used for the purpose of justifying defendant in attempting to put in more than 500,000 feet, it was inadmissible, for the captain had no authority to bind his principals; while, if it was merely an assurance that it would accommodate 500,000 feet, it amounted to no more than a circumstance bearing upon the negligence of the defendant in attempting to put 500,000 feet in the boom after he had been advised not to do so, and was perhaps admissible as part of the *res gestæ*. We think the contract clearly shows that the tug was furnished, with the boom, to be used under the direction of the defendant. The captain of the tug was not authorized to change this relation. The plaintiffs were responsible for any negligent or unskillful performance of his duties, but not for the consequences of his advising the defendant in his business of rafting, running, or handling the logs; and in no sense can the plaintiffs be said to be wrong-doers. If the defendant was aware, or had substantial reasons for believing, that the boom would not accommodate his logs, he had no right to subject the plaintiffs to the danger of loss by attempting to put in more than he had reason to suppose the boom would hold; but, if he did in good faith believe that the boom would hold 500,000 feet, he had a right to attempt to put that quantity in, and hold plaintiffs liable for the unavoidable loss of such as it would not accommodate. An attempt to put in more than 500,000 feet, or more than he had reason to believe the boom would accommodate, when he started the logs, would be at his peril. If the grounding of the logs was the cause of the failure of the tug to take out the logs after they

were inclosed in the boom, the plaintiffs would not be liable, unless it was due to the smallness of the boom; and in such case they would not be liable for the entire loss, if the defendant, knowing the danger, chose to hazard all, rather than to leave a small number of his logs.

The judgment is reversed, and a new trial ordered.

MONTGOMERY, C. J., MOORE and LONG, JJ., concurred with HOOKER, J.

GRANT, J. I concur in the interpretation placed upon the contract by my Brother HOOKER, and concur in all he has said, except as to the statements made by the captain of the tug. Defendant's own foreman told him that the boom would not hold all the logs, and advised him not to put them all in it. Presumably, the foreman knew the size of the logs, and knew that a boom which would hold 500,000 feet of average-sized logs would not hold the same number of feet of logs under the average size. The captain was not authorized to make any representations to bind his principals. The contract was in writing. The captain of the tug was not a lumberman or log-driver. His business was to manage the tug. He may have known, as the record shows, that over 500,000 feet had been included and rafted in this boom; but this would not give him authority to tell defendant that the boom would hold that number of feet of logs less than the average size. I think it was error to permit testimony of statements of the captain.

I think there is one other error upon the record. Plaintiffs sought to show that these logs were less than the average size. In the absence of any representations as to size, the contract was to send a boom sufficient to hold not to exceed 500,000 feet of logs of the average size. Plaintiffs were entitled to show that the boom was sufficient for that purpose, and to show that defendant's logs were below the average size.

MONTGOMERY, C. J., MOORE and LONG, JJ., concurred with GRANT, J.